Adolph KIZAS, et al., Plaintiffs,

v.

William H. WEBSTER, et al., Defendants.

Civ. A. No. 78–983.

United States District Court, District of Columbia.

Feb. 18, 1982.

---

Philip L. Chabot, Jr., and Carol MacKinnon, Washington, D. C., for plaintiffs.

Charles F. Flynn, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

This case is currently before the Court on plaintiffs' Motion for Summary Judgment on damages. The Court previously granted the plaintiff's Motion for Summary Judgment on liability, holding that defendants' termination of a program whereby clerical employees of the Federal Bureau of Investigation received preferential consideration for jobs as special agents with the FBI was a taking of private property without just compensation, in violation of the Fifth Amendment. That memorandum requested further submissions on the measure of damages, noting that "it may well be impossible to compensate plaintiffs precisely; money damages awarded on the basis of 'rough justice' are in order." *Kizas v. Webster,* 492 F.Supp. 1135, 1150 (D.D.C.1980). The plaintiffs' motion is supported by voluminous affidavits from individual plaintiffs and from several economic experts. At oral argument defendant conceded the accuracy of the amounts but disputed the recoverability of all of the elements of damages plaintiffs have claimed on legal grounds. Consequently, a determination by this Court of the elements of damages that are legally recoverable should be dispositive of the issue of damages in this case.

While plaintiffs present two theories of damages in their moving papers, the theory which they urge most strongly is denominated "Theory B." Essentially, this theory seeks to place plaintiffs in as good a position as they would have occupied had the wrongfully terminated clerk-to-agent program never existed. This is contrasted with "Theory A," which would attempt to compensate plaintiffs for termination of the program by placing them in as good a position as they would have occupied had the clerk-to-agent program not been terminated. As such, the distinction corresponds rather closely with the distinction in contract law between reliance damages (Theory B) and expectancy damages (Theory A). *See generally* Fuller & Perdue, *The Reliance Interest in Contract Damages, (Parts I & II),* 46 Yale L.J. 52, 373 (1963–37); J. Calamari & J. Perillo, Contracts § 14–9 (2d ed. 1977).

By analogy to contract law, plaintiffs argue that here the benefit of the bargain, which is the preferential path to special agent status, is too difficult to value, and plaintiffs' damages should accordingly be measured by what the plaintiffs gave up in reliance on the existence of the preference. This is particularly true, plaintiffs claim, where the reliance theory will fully compensate plaintiffs at a lesser cost to defendants than would an expectancy theory. *See Big Rock Mountain Corp. v. Stearns-Roger Corp.,* 388 F.2d 165, 170 (8th Cir. 1968). It is clear from the record that the value of the preference is difficult to quantify, since among other things the percentage of clerks who actually became special agents under the program is unknown. The defendant does not really dispute the appropriateness of this theory itself. Accordingly, the Court concludes that in the context of this case, where the value of the expectancy is admittedly speculative, the reliance measure of damages is the appropriate measure of damages. *See* Restatement (Second) of Contracts § 363 (Tentative Draft No. 14, 1979); Restatement of Contracts § 333 (1932); *Dialist Co. v. Pulford,* 42 Md.App. 173, 399 A.2d 1374 (1979); *In re Yeager Co.,*

227 F.Supp. 92 (N.D. Ohio 1963); *see also United States v. Behan,* 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168 (1884).

The chief argument which defendants make is that, had the contract been fully performed, the value of the performance would have been zero, and that reliance damages must not exceed the value of the contract had it been fully performed. *L. Albert & Son v. Armstrong Rubber Co.,* 178 F.2d 182 (2d Cir. 1949). In support of this defendants cite a number of cases involving employment contracts, in which courts have held that where employment is terminable at will there is no breach of contract, and therefore no damages. This issue has, however, already been resolved against the defendants. *Kizas v. Webster, supra; see also Ashton v. Civiletti,* 613 F.2d 923 (D.C. Cir. 1979). Thus, it is irrelevant that, for example, a teacher with a one-year contract who is wrongfully terminated is entitled to only salary for the remainder of that year. *Wyatt v. School District No. 104,* 148 Mont. 83, 417 P.2d 221 (1966). In such a case, the only wrong suffered is the loss of pay for the remainder of the year. This is not a case in which a wrongful dismissal from a job as a special agent is alleged. Rather, the wrong of which plaintiffs complain is the termination of the opportunity for preferential consideration for the position of special agent, an opportunity which had value even though it was not guaranteed that any particular plaintiff would become a special agent or that he would not be fired if he did become one. Each plaintiff had some chance of becoming such an agent and some chance of remaining in that position. For that chance plaintiffs incurred losses, and these losses are legally compensable where, as here, plaintiffs have been deprived of that opportunity by defendants. *Dialist Co. v. Pulford, supra.*

It is of course true, as defendants argue, that if plaintiff has entered into a losing bargain he is not entitled to better his position at the expense of defendant. *L. Albert & Son v. Armstrong Rubber Co., supra.* However, the burden of proof is upon defendant on this issue, and defendant has offered no evidence that plaintiffs here entered into a losing contract. Rather, for most of the plaintiffs the contract is likely to have been a very beneficial one had it been performed. The defendants' contention that the value of becoming a special agent should be set at zero because special agents can be fired at will overlooks the fact that most special agents are not so fired; the average agent maintains that position 26.77 years. Here, therefore, where there is no showing or attempt to show that plaintiffs would have in fact suffered a loss had the contract been fully performed, plaintiffs are entitled to recover at least the loss they suffered in reliance on the clerk-to-agent program. "It does not lie . . . in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced . . . to lay out and expend." *United States v. Behan supra,* at 345, 45 S.Ct. at 84; *see also L. Albert & Son v. Armstrong Rubber Co., supra,* at 189–90; *Dialist Co. v. Pulford, supra,* 399 A.2d at 1381; *In re Yeager Co., supra; Holt v. United Security Life Ins. & Trust Co.,* 76 N.J.L. 585, 597, 72 A. 301, 306 (1909). Restatement (Second) of Contracts, *supra,* § 363, comment a.

The Court thus concludes that plaintiffs are entitled to recover their reliance losses and reliance expenditures. There remains the necessity of deciding what these losses and expenditures include. The plaintiffs claim as the loss element the difference between what a plaintiff would have earned if he or she had not relied upon the opportunity offered by the FBI and what a plaintiff did earn as a FBI clerk. Plaintiffs use as the amount which a plaintiff would have earned the average earnings of a person of the plaintiff's age, education, sex and race as determined by the Bureau of the Census. There is no dispute over the accuracy of the census figures proffered by plaintiffs or over the appropriateness of use of this data in estimating what each plaintiff would have earned absent the clerk-to-agent program. *See Higgins v. Kennebrew Motors, Inc.,* 547 F.2d 1223 (5th Cir. 1977).

Plaintiffs then claim as each plaintiff's loss the amount determined by subtracting from the census-derived figure the amount actually earned by that plaintiff during the relevant time period. The loss calculation method proposed by plaintiffs is unexceptional and is approved for purposes of this case.

Plaintiffs claim that the relevant time period runs from when each plaintiff began work at the FBI until that plaintiff left or should have left that employment. The date on which plaintiffs assert that a duty to mitigate damages arose is April 4, 1978, the date on which plaintiffs were notified that they could seek alternative employment and still receive credit for their clerical experience in applying for future special agent vacancies. This date is almost one year after the termination of the clerk-to-agent program was announced. As such, it represents a reasonable compromise date, since it would be clearly unreasonable to expect plaintiffs to obtain alternative employment immediately after termination of the clerk-to-agent program. Defendants have not disputed the validity of this date, and the Court thus adopts it as a reasonable date after which any reduced pay suffered by remaining at the FBI will be deemed to be a result of the plaintiff's own choice to remain there. Thus, plaintiffs are entitled to basic damages in the amount of the difference between the amount they earned at the FBI between (a) the time they began and (b) the earlier of their actual departure dates or April 4, 1978 and the average amounts, that persons of their age, sex, race and education earned.

Plaintiffs also claim the right to compensation for their reduced earning capacity beyond this date as a result of their having worked at the FBI during the relevant time period. This argument must be rejected. These damages are too speculative to be awarded. Some plaintiffs may have actually been benefited by their FBI employment; others may have been harmed. The degree of this harm and the rate at which it will diminish in the future is extremely uncertain. As stated previously, it is impossible to calculate these damages with too much precision; a "rough justice" is all that can be expected. This is best achieved by giving the plaintiffs the aforementioned period of slightly less than one year in which to obtain other employment, and to terminate the period of damages after that date.

To this figure there should be added those expenses incurred by plaintiffs in traveling to their place of employment with the FBI. Defendant claims that these expenses are not recoverable because they are made in preparation for performance but such preparatory expenses are of course recoverable under the reliance approach, since they are clearly foreseeable costs of entering into the contract. See Restatement (Second) of Contracts, supra, § 363. However, costs of moving to new jobs obtained by plaintiffs after leaving the FBI are not so recoverable, since they would have in all probability been incurred even had there been no clerk-to-agent program. For example, if a plaintiff moved from Pittsburgh to Washington to join the clerk-to-agent program his expenses of so moving are a consequence of reliance on the program and properly recoverable. However, if the same plaintiff moved to New York after leaving the FBI the expenses of such a move would not be recoverable, since plaintiff would have had to move to New York to obtain that job even had the program never existed.

Plaintiffs also claim a right to recover for amounts spent on educational expenses incurred as a result of the program. However, it is completely speculative whether or not individual plaintiffs would have chosen to obtain a college degree, for example, had the clerk-to-agent program not existed. In addition, the plaintiffs who incurred educational expenses of course obtained the offsetting benefit of the value of the education received. The amount of any difference between what plaintiffs paid for these benefits and what they were worth to plaintiffs is speculative; such expenses may not be recovered here.

Finally, five plaintiffs claim that their spouses suffered unemployment or reduced

wages as a result of their decision to join the clerk-to-agent program. Again, such damages are not recoverable here. It is impossible to tell which plaintiffs' spouses would have been unemployed had they taken employment with someone other than the FBI. In addition, there is no evidence that the defendants could have anticipated that such consequences were likely to flow from the program, and any damages from spousal unemployment would thus appear to be barred by the rule requiring that damages from a breach of contract be reasonably foreseeable. *See Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854); J. Calamari & J. Perillo, *supra*, §§ 14–5—14–7.

Finally, defendant claims that a reduction in the damages awarded should be made to reflect the possibility that some of the plaintiffs might have been unemployed had the clerk-to-agent program not existed. However, this factor is more than compensated for by the fact that the Department of Commerce Current Population Reports, from which the plaintiffs have calculated their amounts for average wages of workers in the plaintiffs respective age, education, race and sex groups tend to understate income by approximately ten percent. *See* Supplemental Affidavit of Paul Garfield, Ph.D. Defendants have not contested this fact. This discount effect more than compensates for the possibility that some of the plaintiffs may have been unemployed in the absence of the program. Even if this were not true, the other items of plaintiff's damages which have been disallowed here as speculative would more than adequately compensate for this speculative possibility.

The Court thus concludes that plaintiffs are entitled to recover the amounts claimed under Phase I of their Theory B for lost wages, as well as any expenses of moving *to* their jobs at the FBI, less any tax savings enjoyed with respect to moving expenses.

Plaintiffs' remaining elements of damages are disallowed. The parties have represented that the amount are not in dispute.

Accordingly, plaintiffs shall, on or before February 22, 1982, submit a form of judgment with the relevant amounts to which each plaintiff is entitled, which order shall have been seen by defendants. Defendants may on or before February 26, 1982, file an objection to these amounts. Upon receipt of these papers, the Court will enter the appropriate summary judgment order.